UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY ALLEN NYE,

          Petitioner,

                                  CASE NO. 2:06-CV-15425

   v.                            JUDGE LAWRENCE P. ZATKOFF

                                  MAGISTRATE JUDGE PAUL J. KOMIVES

RAYMOND BOOKER,

          Respondent.

_____/

# REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
     D.    *Right to Counsel & Jailhouse Informants (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
     E.    *Evidentiary Claims (Claims II & III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
               a. Exclusion of Evidence of Origin of Semen . . . . . . . . . . . . . . . . . . . . . . . . . . 31
               b. Evidence of Mother's Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
     F.    *Sufficiency of the Evidence (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
     G.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.     REPORT:

A.      *Procedural History*

1.      Petitioner Jeffrey Allen Nye is a state prisoner, currently confined at the Ryan Correctional Facility in Detroit, Michigan.

2.      Petitioner was tried in the Oakland County Circuit Court on alternative theories of first degree felony murder and first degree premeditated murder.  His first trial ended in a hung jury. On October 10, 2003, following a second jury trial, petitioner was convicted of first degree felony murder, MICH. COMP. LAWS § 750.316(1)(b), and the lesser offense of second degree murder, MICH. COMP. LAWS § 750.317.  On November 10, 2003, he was sentenced to a mandatory term of life imprisonment without possibility of parole on the first degree murder conviction, and to a term of life imprisonment on the second degree murder conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      WAS IT ERROR FOR THE TRIAL COURT JUDGE TO RULE THAT TWO OF THE DEFENDANT-APPELLANT'S FELLOW JAIL CELL INMATES WERE NOT GOVERNMENT AGENTS AND THAT THE ADMISSION OF THEIR TESTIMONY REGARDING INCULPATORY STATEMENTS ALLEGEDLY MADE BY THE DEFENDANT-APPELLANT WAS NOT PRECLUDED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION?

II.     WAS IT ERROR FOR THE TRIAL COURT JUDGE TO EXCLUDE RELEVANT EVIDENCE REGARDING THE ORIGIN OF SEMEN FOUND IN THE VICTIM'S UNDERPANTS WHERE THE DEFENDANT-APPELLANT WAS CHARGED WITH THIRD DEGREE CRIMINAL SEXUAL CONDUCT AND/OR FIRST DEGREE HOME INVASION AS THE PREDICATE FELONIES TO SUPPORT THE CHARGE OF FIRST DEGREE MURDER?

2

III.    WAS IT ERROR FOR THE TRIAL COURT JUDGE TO ALLOW THE
        PROSECUTION TO PRESENT TESTIMONY REGARDING A
        STATEMENT OF OPINION MADE BY THE DEFENDANT-
        APPELLANT'S MOTHER TO THE EFFECT THAT SHE THOUGHT HER
        SON MIGHT BE GUILTY?

IV.     DID THE INSUFFICIENT EVIDENCE PRESENTED DURING THE
        DEFENDANT-APPELLANT'S TRIAL, TO SUPPORT THE JURY'S
        VERDICTS OF GUILTY BEYOND A REASONABLE DOUBT OF ONE
        COUNT OF FIRST DEGREE FELONY MURDER AND OF ONE COUNT
        OF SECOND DEGREE MURDER, CONSTITUTE A DENIAL OF THE
        DUE PROCESS OF LAW GUARANTEED BY THE FIFTH
        AMENDMENT TO THE UNITED STATES CONSTITUTION?

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence

on the first degree felony murder conviction.  The court *sua sponte* vacated petitioner's second

degree murder conviction on double jeopardy grounds.  *See People v. Nye*, No. 252557, 2005 WL

862042 (Mich. Ct. App. Apr. 14, 2005) (per curiam).

4.      Petitioner, proceeding *pro se*, sought leave to appeal these four issues to the Michigan

Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard

order.  *See People v. Nye*, 474 Mich. 972, 707 N.W.2d 203 (2005).

5.      Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus

on December 7, 2006.  As grounds for the writ of habeas corpus, he raises the four claims that he

raised in the state courts.[1]

6.      Respondent filed his answer on May 19, 2008.  He contends that petitioner's claims

are without merit.

---

[1]On February 16, 2007, petitioner filed an amended petition raising two ineffective assistance
of counsel claims related to the claim that the trial court excluded relevant evidence.  On June 15, 2007,
respondent filed a motion to dismiss the petition, arguing that the two added claims were unexhausted.
On February 28, 2008, I entered an Order directing petitioner to show cause why the petition should
not be dismissed on exhaustion grounds.  In response to the show cause order, petitioner indicated his
desire to delete the unexhausted ineffective assistance of counsel claims from the petition.  On March
20, 2008, the Court entered an order deeming these claims withdrawn, denying respondent's motion to
dismiss, and ordering respondent to file an answer to the petition.

3

7.    Petitioner filed a reply to respondent's answer on July 17, 2008.

B.    *Factual Background Underlying Petitioner's Conviction*

Petitioner was charged with first degree murder in connection with the death of Jennifer Seabold on the evening of July 9-10, 2001.  Petitioner was charged with alternative theories of first degree premeditated murder and first degree felony murder based on the underlying felonies of third degree criminal sexual conduct and first degree home invasion.  The voluminous evidence adduced at trial is accurately summarized in respondent's brief:

> The Seabold family lived in a house at 3023 Thomas in Berkley (II, 107). Jessica lived there with her parents and her two younger sisters: Christina [age 17] and Deanna [age 15] (II,109-111, 155). Thomas Street runs north-south from 11 Mile Rd to 12½ Mile Rd (II, 272-273). The Seabold house is on the west side of Thomas Street, 1½ blocks south of 12 Mile Rd, between Wiltshire and Beverly (II, 273).
>
> Petitioner lived with his mother in an apartment at 4030 W 13 Mile Rd in the City of Royal Oak (II, 283-284, 287, 328) – a little over a mile away from the Seabold house (II, 284-285).
>
> Jessica had graduated from Berkley High School in 2000 (II, 111). At the time of the offense Jessica was 19 years old (II, 116). Jessica Gumbetter was Jessica's best friend (II, 6-7). They had a close knit group of friends (II, 7). Petitioner was not one of that group (II, 7-8, 122). Gumbetter and Jessica had known Petitioner less than a year (II, 9). Petitioner had not been to Jessica's house before the night of July 9th (II, 11, 123), but he sometimes telephoned her (II, 123). Jessica and Gumbetter had been to Petitioner's apartment before (II, 35, 38). They had smoked marijuana there (II, 35). Petitioner supplied marijuana for Jessica on several other occasions (II, 10, 122, 154-155; VIII, 112; X, 66). Petitioner testified at trial that a week or two before the murder Jessica had been arrested for possession of marijuana, and Petitioner knew that the police had talked to her about turning in her supplier (X, 66).
>
> Gumbetter testified that Petitioner seemed to like Jessica "a lot more than a friend" (II, 10). Petitioner testified at trial that he was interested in starting a romantic relationship with Jessica (VIII, 116, 278). But Jessica told Gumbetter that she liked Petitioner as friend, but nothing more (II, 10). Jessica's sister Christina testified that she was not aware of Jessica having any feelings for Petitioner (II, 122-123). A friend of Petitioner's testified that Petitioner's girlfriend Rachel had broken off her relationship with Petitioner about 3 weeks before the murder, and Petitioner was upset about that (VII, 316-317).[3]
>
> > [3]Petitioner's mother testified that just prior to the killing Petitioner had been seeing an anger management counselor because he was upset about his break-up with Rachel (VIII, 35-36).

4

On July 9th, 2001, Jessica's parents were out of town (II, 114). They had gone up north to their cabin (II, 14, 114). Jessica's sister Deanna and the family dog went with them (II, 15, 110, 115). They were scheduled to come back from the cabin the following weekend (II, 116). Jessica and Christina stayed home.

On the afternoon of July 9th, Gumbetter spent time with Jessica and their friend Andy Onstead at the house on Thomas St (II, 12-18). At about 5:00 p.m., Jessica went to work (II, 19). Jessica worked at a Tubby's sandwich shop in Royal Oak (II, 18). It was agreed that Gumbetter and Andy would meet Jessica when she got off work at 9:00 p.m. (II, 19-20).

That evening Gumbetter and Andy drove to Tubby's, arriving a little before 9:00 (II, 20). Because they were early, they waited outside (II, 20). Petitioner and his friend Preston "P-Ditty" Bowen were already there (II, 20). Gumbetter testified that she and Jessica did not know Preston and had not met him before that night (II, 9). Petitioner was wearing a black T shirt with a South Park character named "Timmy" on it (II, 30). Petitioner's car was a red 1985 Mustang (II, 22, 289; VII, 230).[4] The hood of the car was white with a raised scoop, and there was bondo and primer on the right rear quarter panel of the car (II, 144; VII, 295, 299, 374; VIII, 113) and some primer on the trunk (VII, 299-300). It was a very distinct looking car (VII, 295, 373-374). Later, Petitioner told the police that the car was "an eye sore" and that "When you see my car, you know it's me" (VIII, 285). Petitioner's car ran loud (VII, 231-232; VIII, 118).

[4]The registered owner of the Mustang was actually Petitioner's mother Andrea Nye (VII, 41-42).

When Jessica got off work, they all drove to Jessica's house (II, 21-22) and went inside (II, 24). Later, Jessica and Petitioner left to go buy liquor at a party store (II, 24). Petitioner was the only one there that night who was old enough to buy liquor (II, 24). They came back at about 10:00 p.m. with a fifth of Jack Daniels and two large bottles of beer (II, 25, 52). They all sat at the dining room table and played Euchre – a card game (II, 25, 27, 78-79, 127). Jessica and Gumbetter played against Andy and Petitioner (II, 25). Gumbetter and Jessica were drinking Jack Daniels (II, 26, 127). Andy was the only one drinking beer (II, 26). They all smoked marijuana (II, 27, 52, 57).

During the evening, Jessica's sister Christina also had some of her friends over (II, 25). At about 10:30 p.m. Christina, her boyfriend Adam Dancha, and other friends arrived, planning to play cards, drink, and smoke marijuana because her parents were out of town (II, 78, 87-88, 123-126, 149). Christina and her friends played cards in the living room (II, 79-80, 89, 127, 152). At some point that night, Christina told Gumbetter that she could crash at the house for the night if she was high or couldn't drive (II, 151). Christina testified that she thought that Jessica told a few people (not everyone) that they could stay at the house if they were too drunk to drive (II, 151-152).

At about 11:30 (II, 56), when Jessica and Gumbetter lost the card game, they got up from the table and went out on the porch to smoke a cigarette (II, 27-28). Others took their place in the next card game (II, 28) – Dancha and a friend played

against Petitioner and Andy (II, 80-81). Petitioner was getting aggressive and angry when he would lose a hand – there was talk of cheating, and Petitioner slammed his hands/fists on the table (II, 81, 90).

While outside, Jessica got sick and threw up (II, 28). Jessica and Gumbetter then went back inside (II, 28). Jessica sat down in a chair and fell asleep or passed out (II, 29, 31, 57, 128, 153-154). Petitioner and Preston and others were playing cards in the dining room (II, 29).

Christina announced that she was going to Dancha's house and said it was time for them all to leave (II, 29, 129). People left (II, 29-30, 60). Petitioner and Preston left at about 12:15 (II, 129, 153). Christina put Jessica to bed (II, 129). Testimony conflicted about whether Petitioner left before or after Christina helped Jessica to the bedroom (see II, 30-31, 129-130; VII, 249-249). In any event, Christina took Jessica to Christina's bedroom, and put her in bed with her clothes on and put the covers over her (II, 31, 59-60, 130). Jessica was wearing a red halter top and jeans (II, 130, 40-41).

Dancha and Christina then straightened up the house – putting away the liquor bottles, etc. (II, 82, 131). Gumbetter testified that she and Andy were the last ones to leave, along with Christina and Dancha at around 12:30-12:45 (II, 30-31, 68-69, 72). By that point, everyone was gone (II, 131, 179). Dancha and Christina testified that they left around 12:30-1:00 a.m. (II, 98, 133). Dancha locked the back door and then left with Christina through the front door (II, 82-83, 97, 130-132). Christina closed the front door behind her (II, 69, 132, 179). The front door has a self-locking mechanism, so Dancha and Christina did not think it necessary to check to make sure it locked behind them, they assumed it was locked (II, 97, 104, 132-133, 178). Jessica was the only person left in the house (II, 133). Christina and Dancha spent the night at Dancha's house (II, 83-84, 133).

Preston testified that he and Petitioner drove around for about an hour, and then at about 1:30 Petitioner dropped him off at his (Preston's) house, which was about 4 miles away from Jessica's house (VII, 249, 250, 290-291, 314-315).

Suzanne Mattison lived across the street and a few houses north of the Seabolds (II, 230). She worked that night, finishing her job duties by locking up a building in Birmingham sometime after 1:30 a.m. (II, 219-223). Ms. Mattison then drove home (II, 223, 226). She turned south onto Thomas from 12 Mile Rd (II, 226). It was about 2:00 a.m. (II, 229). She came to the stop sign at the intersection with Beverly Street (II, 229), the first cross street south of 12 Mile Rd (II, 234-235). A car caught her attention (II, 230). The car was coming toward her, headed north on Thomas without its headlights on (II, 230-231). The car was speeding (II, 234). The car was driving on the wrong side of the street, headed toward Ms. Mattison (II, 231-232). Then the car turned its highbeam lights on as it got to Beverly (II, 231, 232, 239, 251). The car slowed at the intersection with Beverly, but did not obey the stop sign, it continued straight across Beverly (II, 234-235). The car seemed to run louder than a normal car (II, 234). It was an older red Mustang (II, 234). As the car drove past her, Ms. Mattison looked over at it (II, 232-233). There was only one person in the car (II, 232), the driver was a white male who appeared to be age 17-20 (II, 233). Several weeks later Ms. Mattison saw a picture of Petitioner in the newspaper and thought he looked like the person she saw in the car that night (II, 238). In her

rearview mirror she saw the Mustang continue north on Thomas, headed toward 12 Mile Rd (II, 235, 247-248).

Jayne Chudzinski lived at 3340 Thomas, the first house south of 12 Mile Rd (II, 181). At about 1:30 a.m. on July 10, 2001, she had gotten out of bed because she could not sleep (II, 185-186). She went out on her front porch to smoke (II, 184-186). At about 2:00 a.m. a speeding car caught her attention (II, 186, 189). She paid special attention because she was aggravated by all the speeders on the street and was planning to report the problem to the police (II, 187). This car was speeding up Thomas toward 12 Mile Rd (II, 186). It looked like it was going about 50 mph (II, 201). She could not see the driver (II, 203). It was a burgundy Mustang with a raised hood and appeared to have Bondo on the hood, part of the trunk, and the right rear quarter panel (II, 187-189).

At about 10:00 a.m. the next morning, Christina went home to get some clothes (II, 133-134, 140). When she got to the house, she did not have to use her key to get in, the door was unlocked (II, 134, 165-166). No one had keys to the house except the family members (II, 172-173). Christina went inside (II, 134, 135). She went into the kitchen and straightened up a little bit more (II, 134). Nothing seemed unusual inside the house (II, 135). Christina then headed to her room (II, 134, 135). She was unable to open her bedroom door (II, 135-136). She pushed on the door, but couldn't get it open very far (II, 136). She looked inside her bedroom and saw dark pools that she thought were water all over the floor (II, 136, 166). The carpet in her room is maroon, and it looked wet (II, 136-137). Christina managed to get into her room by squeezing in sideways past the door (II, 137, 171).

She saw Jessica between the bed and the door (II, 137). Jessica's body was blocking the door (II, 171). Jessica's pants were down (II, 139). There was blood spattered all over the dresser (II, 137-138). Christina realized that it was not water she had initially seen, it was blood (II, 138). There was a lot of blood on the bed and on the walls (II, 139, 170). Christina screamed and yelled out Jessica's name (II, 139-140). She tapped Jessica's back, trying to wake her up (II, 138). Jessica did not respond (II, 138). Jessica did not appear to be breathing (II, 140). Christina called 911 and then went out to the porch to wait for the police (II, 139-140).

At 10:28 a.m. on Tuesday July 10, 2001, Lt. Robert North of the Berkley Dept. of Public Safety, was dispatched to the scene (II, 256-257). He arrived within 2-3 minutes and was the first officer at the scene (II, 257-258). Christina was standing on the front porch, and appeared distraught and frightened (II, 258, 263). Lt. North walked up on the porch and asked what was the matter (II, 258). Christina said, "she's in the back, she's in the back" (II, 259). Lt. North went in the house (II, 259). He went directly to the back of the house, to the bedroom at the southwest corner of the first floor (II, 259). The bedroom door was partially open (II, 259). Lt. North looked inside and saw that the room was in disarray (II, 259). When he tried to push the door open with his elbow, he felt resistance from the other side (II, 259-260). Lt. North pushed harder and managed to looked around the door to see the source of the resistance (II, 260) – it was Jessica's body (II, 260-261). Lt. North managed to get himself into the room (II, 264).

Jessica's body was between the foot of the bed and the door (II, 261). Lt. North touched Jessica's back and felt that her body was cold (II, 265). Other officers,

7

including Det. Sgt. Raymond Anger, then arrived (II, 262, 311). Jessica was face down in a fetal position with her knees drawn up underneath her, her hands were drawn up under her neck area (II, 261, 274). She was wearing a red knit top that was open at the back, which was pushed up to her mid-back (II, 274). Her jeans and underwear had been pushed down to her mid-thighs, halfway between her buttocks and her knees (II, 260-261, 274).

The contents of the room appeared to be those of a typical teenaged girl's room, there was a lot of clothing and other items around (II, 275)[5]. There was blood all over the room (II, 261, 262, 267). The red carpeting in the room had several pools of blood on it (II, 275, 302) – there was a pool of blood where the body was found, there was a pool of blood on the mattress, a pool near a nightstand, and a pool on the floor near the dresser (II, 302-303; IV, 303-306). A forensic expert testified that the pools indicated that bleeding happened there and soaked in to the surface (IV, 300-301). There were impact or expirated [coughed out of the mouth (IV, 297-298)] blood stains on the walls (IV, 304-305) as well as flowing blood stains where a large amount of blood hit the wall and then dripped down, possibly arterial spurting (IV, 311-312), and contact stains, including apparent finger smears (IV, 311-312; II, 303). There were passive drops on the top of the bed's foot board (IV, 310-311). There were blood drops along the floor from either passive dripping or arterial spurting (IV, 305-306). Based on the location and types of blood stains, the forensic expert believed that the victim was moving around the room while expirating blood or sustaining impact (IV, 313-314). She was in some locations long enough to leave large contact stains and pools of blood (IV, 313-314).

> [5]The police noted apparent bloody footwear impressions on items of clothing (II, 314; III, 7-8; IV, 7). Later comparison of some shoes taken from Petitioner's apartment did not match these footwear impressions (IV, 15-16, 24-25; V, 21, 22, 23-25; VII, 191-192), but of course the experts had no way of knowing what shoes Petitioner really had been wearing that night (V, 44; VII, 196), and noted that the impressions could have been made by the victim's sister or a police officer (VII, 195-196). On the floor near the bed was a white plastic clothes hanger (II, 276). At the time, Sgt. Anger attached no significance to the hanger (II, 276). Its significance was not learned until much later (II, 308).

The bedding had blood in it, as did a pink towel found on the bed (II, 275). The sheets and towel had contact transfer stains as well as "passive" blood drops, where drops just fell from gravity (IV, 301-302). Analysis of the towel revealed that it blood on both sides, in various places, possibly caused by someone with bloody hands wiping their hands on the towel (VII, 164-165). Because the stains were on both sides of the towel, the towel had moved when the blood was transferred to it, it was not just sitting there (VII, 167). DNA testing matched the blood on the towel to the victim (VII, 158). Later testing revealed no semen or seminal fluid on the sheets (VII, 99-102).[6]

8

There were no signs of a struggle or blood anywhere else in the house (II, 262-263, 282, 334). Sgt. Anger checked all the doors and windows around the house and found no sign of a forced entry (II, 277, 300).[7]

> [6]A forensic expert testified that the absence of a Petitioner's DNA at the scene does not mean he was not involved in the crime (VII, 175-176). The expert testified that real cases aren't like TV shows, and it is not unusual in real life for a perpetrator to leave no DNA at the scene (VII, 175).

> [7]The back door was locked (II, 277). The front door had a very old locking mechanism with two buttons on a metal plate on the side edge of the door [one to lock, the other to unlock] (II, 277-279). The buttons were in the unlocked setting (II, 279-280). If the door were locked and someone used a key to open it, the door would open but the mechanism would still be in the locked position (II, 279-280).

Jessica's body was not moved until medical examiner personnel arrived (II, 281-282). When her body was moved they could then see that her neck was severely lacerated, "It was cut to the point it was almost like her head was cut off." (II, 281-282). There was very little blood on the back of Jessica's body, but the front of her body was covered with blood (II, 282; IV, 309-310). There was a lot of blood staining on her red shirt, blue jeans, and underwear (VI, 287). Her shirt collar was torn (VI, 287-288). Her pants and underwear had been pulled down to mid-thigh, and one of the sides of her underwear was torn (VI, 288).

A forensic specialist from the Oakland County Sheriff's Dept. crime lab photographed the scene and collected fibers from the victim's body (II, 337, 361-364; III, 7; IV, 28-32). The police took a piece of carpet from the bedroom (III, 14), which was unlike the carpet elsewhere in the house (V, 28).[8]

> [8]The police found no fingerprints on the bedroom doorknob (III, 14, 17). Petitioner's fingerprints did not match any prints found in the house (IV, 16, 19-20), but the forensic specialist testified that that did not mean that Petitioner was not the house, it was not unusual to not find identifiable prints at a crime scene (IV, 21-22, 25).

Christina gave police the names of the people that had been at the house the prior evening, including Petitioner (II, 313).

Sgt. Anger went back to the police station later on July 10th (II, 283). Petitioner was already there (II, 312). Petitioner and several of the Jessica's friends were being interviewed (II, 312). Petitioner was being interviewed by Det. Steven Pearson of the Sheriff's Dept. (II, 312; VI, 213-215).[9] Petitioner was not under arrest (VI, 231). Det. Pearson did not relate any details of the crime or the crime scene to Petitioner (VII, 215-219). Sgt. Anger and Det. Pearson wanted to get the clothes that Petitioner had worn the prior evening and asked Petitioner for them (II, 315; VI,

229). Petitioner agreed to take the police back to his apartment (II, 314; VI, 231).
They went to the apartment with Petitioner at about 9:00 p.m. (II, 287, 315; VI, 230).
Petitioner let them into the apartment (II, 315; VI, 230). Petitioner told them what
he had worn that night, and the police took it: a black tee shirt with cartoon character
"Timmy" on it, a pair of khaki pants (II, 285-288; VI, 232-233), and a pair of
sneakers (II, 317; VI, 233, 235).

> [9]Because the City of Berkley does not have many homicides, Sgt.
> Anger requested assistance from the Oakland County Sheriff's Dept.
> on the case (II, 280).

Preliminary testing on the sneaker gave a positive indication for the presence
of blood (VII, 150), but the forensic scientist was unable to get any DNA for testing,
possibly because the amount of blood was insufficient for testing (VII, 151-152, 170-
171). No blood was found on Petitioner's tee shirt and pants (VII, 149, 152), but
testimony indicated that if clothing is laundered soon after blood is deposited on it,
blood would likely not be found later (VII, 172).

Microscopic and Micro-Spectrophotometer analysis revealed that fibers lifted
from Petitioner's tee shirt and pants were consistent in content, chemical
composition, shape, size, and dye-color with the carpeting in the victim's bedroom
(IV, 283-290). The only place in the Seabold house with that red carpeting was
Jessica's bedroom (VII, 61). Analysis of red fibers found on Petitioner's "Timmy"
tee shirt were consistent in content, size, and dye-color with the victim's halter top
(IV, 273-277).[10] The fiber of Petitioner's tee shirt was consistent in content, size, and
dye-color to fibers lifted from the victim's back and buttocks area (IV, 279-281);
from the front of the victim's shirt (IV, 280-281), and from the victim's upper
back/arm area (IV, 281-282).

> [10]A forensic scientist testified that laundering the clothes would not
> have removed all foreign fibers from the clothing (IV, 314-315).

Dr. Bernadino Pacris did an autopsy on Jessica on the morning of July 11,
2001 (VI, 285). Jessica weighed 123 lbs (VI, 327) and was about 5'6" tall (VI, 328).
Jessica died of sharp force injuries and the manner of her death was homicide (VI,
310). There were at least four slashing or cutting wounds across the front and sides
of Jessica's neck (VI, 289-290, 293, 307-308). Those cuts severed her right jugular
vein, her esophagus, her trachea, and her carotid artery (VI, 290), cut some muscles
in her neck, and cut into the vertebrae at the back of her neck (VI, 290-291). The
longest of the four cuts was 7" long, 1/8" wide, and 2½" deep (VI, 292). These
injuries would have caused profuse bleeding (VI, 315-316), and the carotid artery
would have spurted when cut (VI, 346). There were also two smaller cuts on
Jessica's neck that were nonfatal injuries to the muscle of her neck: one ¾" long
below the slashes, and the other 3" long below her left jaw (VI, 294). There was
blood in Jessica's trachea and lungs, which indicated that Jessica did not die
immediately (VI, 304-305). The neck injuries were fatal in three ways: (1) acute

blood loss, (2) suffocation due to aspirated blood, and (3) air embolism (VI, 322). The slash that cut the jugular and carotid was clearly fatal (VI, 323). Dr. Pacris also noted defensive-type cuts on the victim's hands (VI, 292, 294-295). Jessica's injuries were consistent with the attacker cutting her from behind with a knife (VI, 309-310, 317, 347). Dr Pacris testified that if the attacker were behind her, he would not necessarily get blood all over himself (VI, 345-346).

There was an injury to Jessica's vaginal area: a ½-1" recent bruise on her perineum, the area between her vaginal and anal orifices (VI, 303, 330-331). Because her pants had been found at mid-thigh, her underwear was torn, and because of the bruise on her perineum, Dr. Pacris formed the opinion that there was a sexual attack going on (VI, 303-304). On cross examination Dr. Pacris testified that he did not think the bruise was consistent with consensual sex, which she had with her boyfriend Ron Campbell 24 hours before her death (VI, 333-337; see VII, 96). Vaginal, rectal, and oral swabs did not reveal any seminal fluid on Jessica (VII, 136-137), and the pubic hair combing on the victim did not yield any foreign hairs (VII, 141). No seminal fluid from Petitioner was found on the victim's underwear (VII, 133, 139-140).

On July 11th at about noon, Det. Pearson called Petitioner and asked him to come in for an interview, and Petitioner did so (VI, 236-237). Det. Pearson and Sgt. Harvey spoke to Petitioner in an interview room at the Sheriff's Dept. at 4:23 p.m. (VI, 242, 245-246). The interview continued off and on until about 11:00 p.m. (VI, 244, 246). Petitioner did not confess (VI, 270), but at one point when a detective asked Petitioner why this would have happened, Petitioner replied "she screamed", though no one had said anything about the victim getting loud (X, 181). At 8:48 p.m. Petitioner was allowed to call his mother (VI, 262). The detectives stepped out of the room while Petitioner made the call (VI, 262-263). Petitioner had a short conversation with his mother, and it appeared to be an emotional conversation (VI, 263). Petitioner was upset and crying (VI, 263-264). Petitioner's mother testified that Sgt. Michael Elliott was with her when she spoke to Petitioner on the phone (VII, 355,371; VIII, 14). It was a short conversation, and Petitioner sounded very upset (VII, 355-356). Petitioner told his mother that he was a suspect in the killing (VIII, 87-88). "I didn't do it, mom", Petitioner said (VII, 356). After the phone call she told Sgt. Elliott that when Petitioner did something wrong he would always deny any wrongdoing (VIII, 14-17) and that Petitioner was in denial (VIII, 17-18, 100). She told Sgt. Elliot that Petitioner had a lot of trouble handling his emotions and that he got very angry easily (VII, 383). She relayed to Sgt. Elliot that Petitioner was very upset on the phone (VII, 383; VIII, 18).

On July 11th the police took Ms. Chudzinski to see if she could identify the car she had seen speeding on her street (II, 191, 205-207, 211). They went to Petitioner's apartment building parking lot, and the detective asked Ms. Chudzinski if anything looked familiar (II, 191). She pointed out the car she had seen that night (II, 191).[11]

> [11]She told the detective she was 85% sure it was the car (II, 207-208). The reason she was not 100% sure was because she had seen the car at night and was now seeing it in daylight (II, 211).

Dep. David Hendrick went to Petitioner's apartment building to do surveillance on Petitioner's car at about 5-6:00 p.m. on July 11th (IV, 37-38, 43). Dep. Hendrick stayed there a couple of hours (IV, 43). He was in plain clothes in an unmarked car (IV, 38). While he was watching, Dep. Hendrick saw Petitioner's mother go to the car (IV, 38-39). She opened the driver's door, looked under the front seat, looked around the front passenger compartment, and then moved the seat forward and looked in the rear passenger compartment (IV, 39-40). She spent some time doing this, she looked very thoroughly (IV, 39-40). She then closed the driver's door and walked around to the passenger side (IV, 40). She opened the passenger door and examined the door threshold and the door post area (IV, 40). She wiped a small area on the door post and then wiped another small area on the door threshold (IV, 40-41), using her bare fingers (IV, 42-43). Petitioner's mother then looked around the inside front passenger compartment, moved the seat forward, and looked in the rear passenger compartment (IV, 39-41).

Meanwhile, Sgt. Anger got a search warrant for Petitioner's car (II, 288-289). The car was then impounded (II, 289; IV, 45). Although no blood was found on the interior or exterior of the car (VII, 185-187) expert testimony revealed that a killer could have cleaned up whatever blood had been in the car (VII, 198-199).

Petitioner was later arrested for driving on a suspended license (VI, 58-59). Petitioner had not yet been charged with the murder, but was in jail for the driving offense (VI, 58-59). The police suspected that Petitioner might be responsible for the murder (VI, 62). On July 27, 2001, Sgt. David Wurtz and Sgt Gary Miller of the Oakland County Sheriff's Dept. spoke to Phillip Turner, who was an inmate at the jail (IV, 48-49; VI, 17-18, 58-59). Turner had cooperated with the police in the past and had established a record of reliability (VI, 58-59; VII, 76). Sgt. Wurtz approached Turner and spoke to him about putting him in a cell with a homicide suspect (IV, 50-51; VI, 59). Sgt. Wurtz did not offer Turner any deals or compensation for helping (VI, 60-62).[12] Turner agreed (IV, 50-51; VI, 62). Turner was given no information about the case whatsoever, except that it was a homicide (IV, 50-51; VI, 62-63). Turner was placed in a cell with Petitioner that same day (IV, 51-52, 53, 137). Turner had never seen Petitioner before or heard of him (IV, 53-54). They introduced themselves (IV, 53-54). Petitioner said he was there for driving on a suspended license, that he would be out soon, and that the only reason he was in jail was because he was a suspect in a murder that happened in Berkley (IV, 53-56). Turner had not heard about and did not know anything about a murder in Berkley (IV, 55-56).

> [12]Turner was not given any sort of deal or reward in exchange for his testimony (IV, 114-118). Turner testified that he was doing this "Because it's the right thing to do. I have children. And if it was my child, I'd want somebody to come forward." (IV, 120). In fact he had paid a price for his cooperation, he was spit upon, slapped, and labeled a "rat" in prison (IV, 207-208).

Turner asked Petitioner why the police thought he had done it (IV, 56).

Petitioner said he was at a party at Jessica's house, he left, and someone claimed to have seen his car drive back by (IV, 56). Petitioner initially said that he did not actually drive back by (IV, 56-57), but he later told Turner that someone probably did see him go by, but he didn't stop (IV, 61-62). Petitioner said he was at the party with a friend named Preston, that he played cards until about midnight, and that Jessica got sick from drinking (IV, 57-58). Petitioner said he had purchased the alcohol (IV, 57-58). Jessica went outside and then, after getting sick, came back inside and sat on a chair (IV, 58-59). Petitioner said he continued to play cards (IV, 58-59). Jessica's sister wanted everyone to leave so she could put Jessica to bed (IV, 59). Petitioner then left at about 12:30 (IV, 59). Petitioner told Turner that he took Preston home and then went home himself (IV, 59-60). Petitioner did not admit killing or raping the victim (IV, 66, 138-139). Turner asked Petitioner how the victim was killed (IV, 62-63). Petitioner said her throat was slit (IV, 63). Petitioner told Turner that the victim's pants were halfway to her knees (IV, 63). Petitioner said that he wanted Jessica to be his woman (IV, 61). Turner asked if Petitioner and Jessica had ever done anything, and Petitioner said that he had gotten oral sex from Jessica before and he tried to get some on the night of the murder (IV, 63-64, 182-186).

Turner and Petitioner were only in the cell together for about an hour before Petitioner bonded out (IV, 64, 140; VI, 64, 77). After Petitioner left, Turner went to the detectives bureau (IV, 64-65). Turner told the detectives what Petitioner had said (IV, 64-65; VI, 64).

On August 4th, Petitioner was arrested for possession of marijuana and was again lodged at the jail (VI, 67). On August 6, 2001, Turner was brought back to the detective bureau and asked if he would be willing to be placed in a cell with Petitioner again (IV, 66-68; VI, 68; VII, 13). Turner said he had no problem with that (IV, 67-68). Turner was not promised anything for his help (VII, 15-16). Again, he was not given any information about the case (IV, 68-68; VI, 69; VII, 16-17). Turner was again put in a cell with Petitioner on August 6th (VI, 69, 78, 81; VII, 17).

Over the course of the next couple of days (IV, 72), Petitioner told Turner that the police were still harassing him about the murder (IV, 69-70). Petitioner asked if there was any way to stop the harassment (IV, 70, 71). Turner suggested filing a motion to get evidence suppressed (IV, 70, 147-148). Turner told Petitioner he would have to write out a statement about what happened and to be completely honest (IV, 75-76). Petitioner agreed (IV, 76). Petitioner wrote out a list of people who could verify the alleged harassment, and a list of items the police had taken (IV, 78-80). Turner told Petitioner that Petitioner needed to give him an honest and detailed account of what happened the night of the killing (IV, 84-85).

Petitioner told Turner that on the night of the party he and his friend Preston met Jessica at her job at about 9:00 (IV, 84-86). Andy and the other Jessica [Gumbetter] also showed up there (IV, 85-86). They all went to the party (IV, 85-86). Petitioner said he went to the store and got something to drink for Jessica and Andy (IV, 85-86). Petitioner got high and drank (IV, 85-86). Petitioner said he played cards (IV, 86). Jessica got sick so they took her outside; when she was done being sick they brought her back inside and laid her on a chair (IV, 86). Petitioner continued to play cards until Jessica's sister said that everyone had to leave (IV, 86-

13

87). Petitioner left and took Preston home (IV, 86-87). Petitioner told Turner that he
(Petitioner) then drove back to Jessica's house (IV, 87-88). He knocked on the
door (IV, 87-88). No one answered so he went inside (IV, 87-88). Petitioner went to the
back bedroom where Jessica was and "tried to get with her" (IV, 88). Jessica reacted
by getting upset, and they argued (IV, 88-89). Jessica got loud (IV, 185-186).
Petitioner told Turner that when Jessica got upset, he cut her throat (IV, 88-89).
When he realized what he had done, Petitioner noticed there was blood all over him
(IV, 89). Petitioner told Turner that he wiped his hands off on a towel and a sheet and
then hurriedly left (IV, 89).

Turner told Petitioner he needed to write it down in his own words (IV, 89).
Petitioner wrote out a statement and signed it (IV, 89-90) [sic throughout]:

> Went to a party at Jessicas house with Prestin a 9:00 pm. Sat out front
> talking with Andy, Jessica and Jessica Seabold. Seabold ask me to
> got to corner store and by some drink. Returned to house, went inside
> a began playing cards. Girls drank and we smoked a joint. Played 2
> hands of cards. Jessica and Seabold got up went outside and Seabold
> got sick. At 11:30 pm. Seabold returnd inside a sat it chair and passed
> out. Played one more hand of cards. During last hand Seabold's sister
> ask Andy to help Jessica to bed so her friends would leave. After
> game we got up went outside for 20 or so minutes talked and smoke
> a cig. Andy went inside asked somebody to mover there car. Preston
> and I left. Took a ride. Dropped Preston of at home. Drove side
> streets home past a few friends houses. Went by Toma's house then
> back to Jessica's house. Knock on door went in had some words with
> Jessica. Tried to get with her. She refused got load cut her throat.
> Relized what happed. Left in a hurry. Went home.
>
>                                                          Jeff

(IV, 93-96; Trial Exhibit 43)
Turner testified that Petitioner was writing what happened, **not** just writing what he
had been accused of doing (IV, 204-206).

Turner met with the detectives and relayed what Petitioner had said and gave
them Petitioner's written statement (IV, 96-97, 99; VII, 20). After returning to the
cell, Turner and Petitioner spoke some more about the case (IV, 100). Turner asked
Petitioner what happened after the murder (IV, 101). Petitioner said that he noticed
there was blood on him, so he wiped his hands on a towel and a sheet (IV, 101-102).
Turner asked Petitioner why he did not have blood all over him, and Petitioner said
that he attacked the victim from behind and he was over on top of her (IV, 103-105,
109-110). Petitioner demonstrated to Turner how he cut her throat from behind, so
he only got blood on his arms and hands (IV, 109-110). Petitioner mentioned that
there was a clothes hanger next to the victim (IV, 104). Petitioner said he left in a
hurry (IV, 101-102). Petitioner said he took the knife with him and threw it in a
dumpster behind a party store (IV, 104-105). He then drove home (IV, 104-105). He
wiped off the gear shift in his car (IV, 101-102). When he got home he washed his
clothes (IV, 102). Petitioner then wrote out what happened after the murder for
Turner (IV, 101-102, 104-106) [sic throughout]:

14

After the murder, blood was on hands and arms. I wiped my hands and arms clean with sheet a towal. As leave home made sure not to get blood on myself. Hurried a left, Went down Thomas street north to first stop sing, turned right went to 12 Mile throug knife in dumpster. Then went home parked car wiped down steering wheel and gear shifter with towal, went inside, removed clothing. Wash them then went to bed for the night.

Jeff Nye

(IV, 105-106; Trial Exhibit 44)

Turner met with the detectives again on August 8th (IV, 102-104, 106-107; VII, 25-26) and told them what Petitioner had said and gave them the second written statement (IV, 111; VII, 26-27). Turner indicated that Petitioner said there was a coat hanger next to the victim (VII, 28). No coat hanger had been collected from the crime scene, and the police did not know that a coat hanger had any significance before this (VII, 28). After meeting with Turner, Sgt. Miller went to his office and reviewed photos of the crime scene (VII, 29), they depicted a hanger near the victim's body (VII, 30). In his two interviews with the police, Petitioner had said the only place he had been in Jessica's house was the living room and dining room, so by talking about the coat hanger Petitioner had put himself at the scene of the crime (VII, 29).

A forensic handwriting and document expert compared a known sample of Petitioner's handwriting to the written statements Petitioner gave to Turner (IV, 235-255). Her opinion was that the same person wrote them all (IV, 256-258).

A warrant charging Petitioner with the homicide was issued on August 9, 2001 (VII, 9, 31), and Petitioner was arraigned on August 10, 2001 (VII, 31).

William Dunlap was a pretrial inmate at the Oakland County Jail, charged with armed robbery (V, 51, 52). While at the jail, Dunlap shared a cell with Petitioner (V, 52-53). Dunlap had never met Petitioner before, did not know who he was, and had not heard of the Berkley murder (V, 53). Inmates often talked about their cases (V, 62). Petitioner talked to Dunlap about his (Petitioner's) case (V, 54-55). The details surrounding Petitioner's statements to Dunlap are discussed *infra* in Issue I. Petitioner told Dunlap that he had been arrested for raping and murdering a girl in Berkley after a party (V, 62). Petitioner said he was at the party (V, 62). Petitioner did not come out and say that he had raped or killed the victim (V, 69) but he said that when he got home at 2:30 he turned the clocks back to 1:30 and then woke his mother so that she could give him an alibi (V, 63-64). Petitioner was then moved to another cell (V, 66).

Dunlap then told the police what Petitioner had said (V, 57-59, 65; VII, 33-34). The detectives made clear that they could not make any deals with Dunlap (V, 60, 67, 72; VII, 34-38).[13] The detectives asked Dunlap if he would mind being put in the same cell with Petitioner again, and Dunlap said he wouldn't mind (V, 68-69). Dunlap was then moved to join Petitioner in a different cell (V, 70; VII, 36). Petitioner told Dunlap more details about the crime as time went on (V, 72).

15

[13]Dunlap testified that no deals were given (V, 93-94). He testified in this case "Because it's the right thing to do", he had daughters and a sister Jessica's age and felt he had to come forward to help a family who lost a daughter (V, 98, 142). Dunlap paid a price for his cooperation, he had gotten death threats in prison and word had spread that he was cooperating in this case (V, 20-30, 32).

Petitioner told Dunlap that he was playing Euchre and smoking marijuana at the party that night with his friend Preston a/k/a P-Ditty (V, 74-75). Petitioner said the victim's name was Jessica Seabold, but Petitioner referred to her as "Jessie" (V, 75). Jessica's parents were out of town (V, 78-79). Petitioner told Dunlap that from the first time he saw Jessica he wanted to "kill the pussy", and the reason he went to the party that night was that he thought it was an opportunity to try to be with her (V, 76). Dunlap testified he did not know exactly what Petitioner meant by "kill the pussy" (V, 171-172). Petitioner told Dunlap that Jessica had just broken up with her boyfriend and Petitioner kept asking her to spend the night with him, but she kept saying she was not ready for that – she just wanted to be friends and take it slow (V, 76). Dunlap testified that when Petitioner talked about Jessica it was all about sex, he wanted to have sex with her (V, 77). Petitioner told Dunlap that he took Jessica to a store and bought some Jack Daniels that she wanted (V, 77). They went back to the party, and Jessica got drunk and passed out in a chair in the living room (V, 77-78). Eventually the sister told everyone they had to go because she was getting ready to leave to spend the night at her boyfriend's house (V, 78). The sister had some friends take Jessica to the back bedroom (V, 78). Petitioner told Dunlap that he left at 12:30 (V, 78, 80). Petitioner and Preston went driving around in the area of Woodward and I-696, and then Petitioner dropped Preston off at home (V, 80).

Petitioner told Dunlap that he (Petitioner) told the police that he then went home; but he told Dunlap in other conversations that, in fact, he went back to Jessica's house (V, 80). Petitioner said that he went back to Jessica's house because he knew she was passed out, everyone else was gone, and he was hoping to be with her (V, 86-87). He knocked on the door (V, 87). He checked the door and discovered it was unlocked (V, 87). He went inside (V, 87). Petitioner said he went into the kitchen and got a knife from a set of knives in a block (V, 81-82). He went back to the bedroom where he knew Jessica was, he thought she would still be passed out in bed (V, 81). Jessica was asleep or passed out (V, 87, 173-174). Petitioner set the knife down on the bed (V, 87-88). Petitioner pulled Jessica's pants and underwear down below her knees and started to rape her (V, 88). Jessica "came to" and started to struggle: "The bitch fought", Petitioner said (V, 88). He told Dunlap the police would not find his sperm or DNA (V, 84) because when he has an orgasm he does not ejaculate (V, 176). Petitioner told Dunlap that he reached for the knife, but it was out of his reach (V, 88). He grabbed for the nearest item – a coat hanger (V, 81, 88). He grabbed the hanger and started to stab Jessica with it as she fought with him, stabbing and gouging her in the neck (V, 88, 175). Eventually Petitioner managed to grab the knife (V, 88). He cut her throat with the knife to make sure she was done

16

(V, 176). Petitioner told Dunlap he used the knife to cut Jessica's throat about eight times (V, 82, 88). Petitioner told Dunlap that he wiped blood off his arms with sheets and towels (V, 83). Petitioner left in his car, taking the knife and a towel with him (V, 88). Petitioner wiped down his car with the towel (V, 89, 170-171). Petitioner threw away the knife and towel (V, 88). Petitioner went home (V, 88). Petitioner said that he washed his clothes in bleach when he got home, in the apartment building laundry area (V, 83-84).

Dunlap relayed this information to the police (VII, 40, 48-49), including the reference to the murder weapon being a knife from the knife block (VII, 49). There had been no report of the knife missing from the block, and the police did not even know there was a knife block in the house (VII, 49-50; II, 293-294). Detectives then met with the Seabold family (II, 290, 291; VII, 49). They went to the house and collected the knife block (II, 290-291; VII, 51). It had several slots and pockets in it and contained knives of various sizes as well as other utensils (II, 290-291). One knife slot was empty, that knife was missing (II, 292). Jessica's mother Deborah Seabold testified that all the knives had been in the knife block when they went up north on July 9, 2001 (VII, 202). She had noticed a knife was missing soon a few days after the crime, but had not mentioned it to the police at that time (VII, 203-204, 207-208, 211).

Cornelius Harris was arrested on August 24, 2001, for an assault and was held at the jail (VI, 15-16, 115, 173). At some point in November of 2001, Petitioner moved into the same cell (VI, 116, 119). Harris had not been purposefully placed in a cell with Petitioner (VII, 54). Harris had never spoken to the police about being in the same cell as Petitioner (VI, 120), and the police did not in any way direct his conversations with Petitioner (VI, 162).[14] Harris did not know anything about the murder in this case (VI, 146, 162). Petitioner and Harris became friendly at the jail (VI, 120). Over the course of weeks and months and many conversations (VI, 137) Petitioner spoke about the case. Petitioner said he was there on a murder charge (VI, 139). At first, Petitioner maintained his innocence (VI, 139). But, as he and Harris got closer, Petitioner's story changed (VI, 140, 188-189). Petitioner said that he was invited over to Jessica's house that night, and her parents were out of town (VI, 145). Petitioner left the house to go to the store one time with Jessica and his friend P-Ditty to get some drinks (VI, 145-146). Petitioner told Harris that when he was at the party he and P-Ditty were playing a card game against two other guys (VI, 146-147).

> [14]Cornelius Harris was not offered or given anything in exchange for his testimony in this case (VI, 160-162) but he was hoping his cooperation would result in some leniency (VI, 175-176). At the time of trial he was in jail awaiting sentencing after pleading guilty (VI, 184).

Petitioner told Harris that Jessica was his girlfriend and they were going to "hook up", i.e. get together and have sex (VI, 148). Harris testified that Petitioner used the phrase "kill the pussy" when talking about having sex with a female (VI,

148). Petitioner told Harris that he left the party and took P-Ditty home (VI, 147-148). Petitioner told Harris that he then drove back to Jessica's house, planning to have sex with her (VI, 148-149, 151). When Jessica did not cooperate, he cut her (VI, 151). Petitioner had earlier told Harris that the sex was consensual but then he said it was not consensual (VI, 203); Petitioner had earlier indicated to Harris that Jessica was his girlfriend, but he finally said that she was just a girl he liked and had a crush on (VI, 203). Petitioner told Harris that he had cut Jessica's throat with a knife (VI, 150, 151). Petitioner said there was blood everywhere and on him (VI, 159-160). Petitioner said he cleaned himself up (VI, 160). Petitioner bragged that the police would not find his DNA (VI, 153). But he said that someone up the road saw him drive away (VI, 154). Petitioner told Harris that he washed his clothes afterward (VI, 151-152, 159) and he cleaned out his car (VI, 160).

The parties stipulated at trial that Jessica had consensual sexual intercourse with her boyfriend Ronald Campbell on July 8, 2001 (VII, 88-89), and the stipulation was read to the jury,

> [I]f called to testify, Ronnie Campbell, Jessica Seabold's boyfriend at the time, would state that he had consensual sexual intercourse with Jessica Seabold on or about July 8th, 2001.
>
> This stipulation is only relevant as to the possible cause of the victim's vaginal injury.

(VII, 96).

Petitioner's mother testified as a defense witness. She testified that on the night of the party Petitioner came home and came into her bedroom to check on her (VII, 333-334). She testified that the clock on her bedside table showed the time as 1:30-1:45 (VII, 334-335). Ms. Nye testified that she got out of bed and went to get a drink in the kitchen at about 2:00 (VII, 339-340), and on her way there she saw Petitioner asleep on the hide-a-bed in the living room (VII, 340). She got out of bed again at about 3:00 to go to the bathroom, and Petitioner was still asleep, snoring (VII, 340-341). Ms. Nye testified that, while Petitioner was at the police station on July 11th, she went out to the Mustang to roll up the windows because it was going to rain and because she wanted to look at it since she had never seen it (VII, 353, 374). She denied cleaning the car or removing anything from it and denied looking for anything or wiping anything out (VII, 354, 377). On cross-examination Ms. Nye testified that the floor of the car was wet (VII, 378-381).

Petitioner testified at trial. He testified that he and Preston left Jessica's house no later than 1:00 (VIII, 137, 139, 296, 300). He testified that while at Jessica's house, he never went in the bedroom (VIII, 149, 291-292), he just walked through the living room and was in the dining room (VIII, 149). Petitioner and Preston drove around a while, and then he dropped off Preston at home at about 1:30 (VIII, 140-145, 340). Petitioner then drove home, getting there between 1:30 and 2:00 (VIII, 148). At trial Petitioner admitted giving the police conflicting descriptions of how he got into his apartment – at one point he said he used his keys, and at another point he said his mother had to let him in because he had left his keys at home (IX, 153-154). Petitioner testified that he got undressed, watched TV, and went to sleep (VIII,

150-151). Petitioner denied washing his clothes that night or the next day (VIII, 151, 158). He denied cleaning out his car (VIII, 159). Petitioner testified that he did not leave his apartment that night (VIII, 152). He denied going back to Jessica's house (VIII, 149, 152, 244-245), and he denied killing or raping Jessica (VIII, 152, 245).

At trial, Petitioner admitted lying to the police about some things during his initial interviews, such as whether Jessica's sister told him that she had locked the house when she left (IX, 145-149) and whether Petitioner had smoked marijuana at the party (VIII 164-165, 293). Petitioner testified that when the police interviewed him on July 11th, they accused him of killing Jessica and asked him why he did it (VIII, 180). Petitioner told them he did not do it (VIII, 181). Petitioner testified that a detective proposed scenarios, asking if Jessica had insulted him (VIII, 185), if she had made derogatory comments about his genitals, or of they had gotten into an argument and Petitioner blacked out (VIII, 189; IX, 173). Petitioner kept asserting his innocence during the interview (VIII, 184). Petitioner testified that he was never allowed to view photographs in the interview (VIII, 182), but at one point as the detectives were discussing something amongst themselves, they opened a manila folder file that contained some pictures (VIII, 182-183, 307). Petitioner testified that he was able to see some of the pictures from a distance (VIII, 183, 307) – he did not see a body (VIII, 310-311).

At trial Petitioner denied ever telling fellow-inmate Turner that he had raped or murdered Jessica (VIII, 269). He testified that he consistently maintained his innocence with Turner (IX, 101). He admitted writing out the first statement and giving it to Turner (VIII, 228, 231), but claimed that the statement was just his recounting of what the police had accused him of doing (VIII, 229). Petitioner testified that the part of the statement where he described going back to Jessica's house was based on the police telling him that someone had seen Petitioner's car come back later (VIII, 231-232). Petitioner testified that the part of the statement describing going into the house, trying to "get with" Jessica, and cutting her throat was part of one of the scenarios that he had heard from the detectives (VIII, 232-233). Petitioner testified at trial that his second written statement was "role playing of what the police were accusing me of doing" (VIII, 234; X, 71). Petitioner testified that he did not feel he was admitting to a crime when he wrote the statement (VIII, 235). Petitioner testified that in the statement he hypothesized and inferred what the police thought had happened (VIII, 234-235), even though the police had not said anything about wiping his hands on a towel or sheet (IX, 56, 113-114, 118-119; X, 98-99, 182, 184), even though the police had not said anything about a dumpster (IX, 49; X, 183), even though the police had not said anything about a knife as opposed to some other sharp instrument (IX, 128-129; X, 183), even though the police had not specifically accused him of wiping down the steering wheel or gear shifter or door handle (IX, 57-58, 170-171; X, 183), and even though the police had not said anything about him washing his clothes (X, 183).

At trial Petitioner denied confessing to fellow-inmate Dunlap (VIII, 257, 269). He denied telling Dunlap that he stabbed or gouged Jessica in the neck with a coat hanger (VIII, 254-255). Petitioner denied telling Dunlap that he had changed the time on his mother's clock (VIII, 256). He denied telling Dunlap he went back to

Jessica's house after the party (VIII, 257). He denied saying anything about a knife block (X, 37-38). But on cross examination, Petitioner admitted telling Dunlap about wiping his hands on a towel and a sheet, about wiping down the car (X, 35), and about washing his clothes (X, 36).

At trial Petitioner denied confessing to fellow-inmate Harris (VIII, 264, 269).

In rebuttal, Sgt. William Harvey and Sgt. David Wurtz testified that at no time during the interviews was Petitioner shown any photographs – there were no crime scene photos at that time (X, 181, 182, 205). The crime scene was not described to Petitioner (X, 184).

The jury found Petitioner guilty of felony murder, and guilty of second degree murder rather than first degree premeditated murder (XI, 48-49).

Respondent's Answer, at 4-30.

C.     *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

20

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme

Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.     *Right to Counsel & Jailhouse Informants (Claim I)*

Petitioner first contends that he was denied his Sixth Amendment right to counsel when the statements he made to his cell mates, elicited outside the presence of counsel, were introduced at trial.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Clearly Established Law*

The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. CONST. amend VI.  The right to counsel exists at all so-called "critical stages" of the trial process, that is, "at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected."  *Mempa v. Ray*, 389 U.S. 128, 134 (1967).  "Critical stages" include those proceedings "where the results might well settle the accused's fate and reduce the trial itself to a mere formality."  *United States v. Wade*, 388 U.S. 218, 224 (1967).  The Sixth Amendment right to counsel, however is not implicated when criminal proceedings have yet to commence.  By its terms, the Sixth Amendment applies only to "criminal prosecutions."  As the Supreme Court has explained:

> The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor.  Its purpose, rather, is to assure

> that in any "criminal prosecutio[n]," U.S. Const., Amdt. 6, the accused shall not be left to his own devices in facing the "'prosecutorial forces of organized society.'" *Maine v. Moulton*, *supra*, 474 U.S., at 170, 106 S.Ct., at 484 (quoting *Kirby v. Illinois*, *supra*, 406 U.S., at 689, 92 S.Ct., at 1882). By its very terms, it becomes applicable only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the "intricacies ... of law," *ibid.*, is needed to assure that the prosecution's case encounters "the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984).

*Moran v. Burbine*, 475 U.S. 412, 430 (1986).  Thus, the Sixth Amendment right to counsel "does not attach until a prosecution is commenced, that is, after the initiation of adversary judicial criminal proceedings–whether by way of formal charges, preliminary hearing, indictment, information, or arraignment." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991); *accord Texas v. Cobb*, 532 U.S. 162, 167-68 (2001); *Kirby v. Illinois*, 406 U.S. 682, 689-90 (1972) (plurality op.).  "Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him" *Brewer v. Williams*, 430 U.S. 387, 398 (1977).

Where the Sixth Amendment right to counsel has attached, police questioning outside the presence of counsel violates the Sixth Amendment, absent a valid waiver of the right to counsel by the accused.  *See Montejo v. United States*, 556 U.S. ___, ___, No. 07-1529, slip op. at 6-7 (May 26, 2009) (citations omitted) ("Under our precedents, once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings.  Interrogation by the State is such a stage.").  A defendant's Sixth Amendment right to counsel is violated "when there [is] used against him at his trial evidence of his own incriminating words, which [police agents] had deliberately elicited from him after he had been indicated and in the absence of counsel." *Massiah v. United States*, 377 U.S. 201, 206 (1964).  This rule applies regardless of whether the information is elicited by the police or

23

an agent of the police, such as an undercover informant.  *See United States v. Henry*, 447 U.S. 264,

269-71 (1980).  As the Supreme Court has explained:

> [A]fter a formal accusation has been made-and a person who had previously
> been just a "suspect" has become an "accused" within the meaning of the Sixth
> Amendment-the constitutional right to the assistance of counsel is of such
> importance that the police may no longer employ techniques for eliciting information
> from an uncounseled defendant that might have been entirely proper at an earlier
> stage of their investigation. Thus, the surreptitious employment of a cellmate, see
> *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), or the
> electronic surveillance of conversations with third parties, see *Maine v. Moulton*,
> *supra*; *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246
> (1964), may violate the defendant's Sixth Amendment right to counsel even though
> the same methods of investigation might have been permissible before arraignment
> or indictment.

*Michigan v. Jackson*, 475 U.S. 625, 632 (1986), *overruled on other grounds by Montejo*, 556 U.S.

___, No. 07-1529 (May 26, 2009).  *Massiah* thus establishes three elements necessary for finding

a Sixth Amendment violation: "(1) the right to counsel must have attached at the time of the alleged

infringement; (2) the informant must have been acting as a 'government agent'; and (3) the

informant must have engaged in 'deliberate elicitation' of incriminating information from the

defendant."  *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 892 (3d Cir. 1999).

Further, the Supreme Court has explained that the Sixth Amendment right to counsel is

offense specific, and that attachment of the right with respect to one criminal charge does not

prohibit police interrogation in the absence of counsel with respect to other charges for which formal

adversary proceedings have yet to commence.  *See McNeil*, 501 U.S. at 175.

2.      *Analysis*

Petitioner made incriminating statements to two separate inmates during his pre-trial custody.

With respect to petitioner's statements to Turner, the Michigan Court of Appeals concluded that

petitioner's Sixth Amendment right to counsel was not violated because petitioner had only been

24

2:06-cv-15425-LPZ-PJK   Doc # 26   Filed 06/01/09   Pg 25 of 38   Pg ID 7716

charged with driving offenses at that point, and formal adversary proceedings on the murder charge had not yet been initiated. *See Nye*, 2005 WL 862042, at *2. With respect to petitioner's statements to Dunlap, the court of appeals concluded that Dunlap was not acting as an agent of the police at the time that petitioner made his incriminating statements, nor did Dunlap "deliberately elicit" the statements, and thus that petitioner's right to counsel was not violated by the introduction of these statements. *See id*. at *2-*4. The Court should conclude that these determinations were reasonable.

It is clear that no Sixth Amendment violation occurred with respect to petitioner's statements to Turner. At the time of petitioner's first discussion with Turner, petitioner was being detained pursuant to an arrest for driving on a suspended licence. *See* Trial Tr., Vol. VI, at 58-59. At the time of the second discussion, petitioner was being detained pursuant to an arrest for possession of marijuana. *See id*. at 67. There is no question that no formal criminal proceedings had been initiated with respect to the murder of Jessica Seabold. Petitioner had not been arrested for that crime, no complaint had been filed, and no formal proceedings with respect to the murder had occurred. Because, as discussed above, the Sixth Amendment right is offense specific, and because petitioner's Sixth Amendment right to counsel had not yet attached with respect to the murder, the elicitation of an incriminating statement relating to the murder from petitioner by Turner did not violate petitioner's right to counsel with respect to the murder charge. *See Illinois v. Perkins*, 496 U.S. 292, 299 (1990); *United States v. Ford*, 176 F.3d 376, 380 (6th Cir. 1999) ("[T]he fact that law enforcement officers arranged for an informant to converse with an indicted defendant about offenses other than those for which the defendant had been indicted is not unlawful.").

With respect to Dunlap, the Michigan Court of Appeals concluded that petitioner was not entitled to relief because Dunlap was not an agent of the police at the time petitioner made his incriminating statements, and because Dunlap did not deliberately elicit those statements from

25

petitioner.  These determinations were reasonable.  As the Third Circuit has explained, "[t]he Supreme Court has not formally defined the term 'government agent' for Sixth Amendment purposes.  In its sole case focusing on a determination of government agency, the Supreme Court found the informant was an agent because he was paid and 'acting under instructions' from the government." *Matteo*, 171 F.3d at 893 (discussing *Henry*, 447 U.S. at 270).  The courts of appeals that have considered the issue have therefore held that "[a]n informant becomes a government agent for purposes of [*Massiah*] only when the informant has been instructed by the police to get information about the particular defendant." *United States v. Birbal*, 113 F.3d 342, 346 (2d Cir. 1997) (citing cases); *see also*, *Moore v. United States*, 178 F.3d 994, 999 (8th Cir. 1999); *United States v. Brink*, 39 F.3d 419, 423 (3d Cir. 1994) ("An inmate who voluntarily furnishes information without instruction from the government is not a government agent, even if the informant had been an agent in the past.").  Here, Dunlap testified that he did not know petitioner or have any information about the murder prior to petitioner's statements to him in the cell.  Dunlap and the officers testified that there was no agreement of any kind between the police and Dunlap, and the police did not initially seek out Dunlap's assistance.  Petitioner has pointed to no evidence to rebut this testimony.  Thus, at least at the initial exchange between petitioner and Dunlap, Dunlap was not acting as a government agent.

It is true that after Dunlap initially reported petitioner's statements to the police officers they asked him if he would mind being placed again in a cell with petitioner.  Even if this alone were sufficient to establish that Dunlap were a government agent at that point, however, petitioner is not entitled to habeas relief because the Michigan Court of Appeals reasonably determined that Dunlap did not deliberately elicit any incriminating statements.  In *Kuhlmann v. Wilson*, 477 U.S. 436 (1986), the Supreme Court explained:

26

> [T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since "the Sixth Amendment is not violated whenever–by luck or happenstance–the State obtains incriminating statements from the accused after the right to counsel has attached," a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Id*. at 459 (citations omitted). At the evidentiary hearing, Dunlap and the police officer testified that Dunlap was instructed to listen and not to initiate conversation, and Dunlap testified that he never initiated any discussions with petitioner regarding the crime or petitioner's case. Again, petitioner has pointed to no evidence to rebut these factual findings, and under these facts Dunlap did not deliberately elicit incriminating remarks from petitioner.

Because petitioner's Sixth Amendment right to counsel had not attached at the time he gave his incriminating statements to Turner, and because Dunlap neither was a government agent nor deliberately elicited incriminating statements from petitioner, the Michigan Court of Appeals's rejection of petitioner's claim was a reasonable application of *Massiah* and its progeny. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.      *Evidentiary Claims (Claims II & III)*

In his second and third claims, petitioner challenges the trial court's evidentiary rulings. Specifically, petitioner contends that the trial court erred in excluding evidence regarding the origin of semen found on the victim's underpants, and in allowing the prosecutor to present evidence that his mother thought he might be guilty. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the

27

application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994). In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

Although the Constitution does not explicitly provide a criminal defendant with the right to "present a defense," the Sixth Amendment provides a defendant with the right to process to obtain witnesses in his favor and to confront the witnesses against him, and the Fourteenth Amendment guarantees a defendant due process of law.  Implicit in these provisions is the right to present a meaningful defense.  As the Supreme Court has recognized, "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967).  "The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact.  The right to offer testimony is thus grounded in the Sixth Amendment." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988).  Further, the Court has noted that "[t]his right is a fundamental element of due process of law," *Washington*, 388 U.S. at 19, and that "[f]ew rights are more fundamental[.]" *Taylor*, 484 U.S. at 408.  Although the right to present a defense is fundamental, it is not absolute.  Thus, the right must yield to other constitutional rights, *see e.g.*, *United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978) ("The Sixth Amendment right of an accused to compulsory process to secure attendance of a witness does not include the right to compel the witness to waive his Fifth Amendment privilege."), or to other legitimate demands of the criminal justice system, *see United States v. Scheffer*, 523 U.S. 303, 308 (1998).

Further, to constitute a denial of the right to present a defense, a trial court's exclusion of evidence must "infringe[] upon a weighty interest of the accused."  *Scheffer*, 523 U.S. at 308.  A "weighty interest of the accused" is infringed where "the exclusion of evidence seriously undermined 'fundamental elements of the defendant's defense' against the crime charged." *Miskel*

29

*v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315). Thus, "'[w]hether

the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends

upon whether the omitted evidence [evaluated in the context of the entire record] creates a

reasonable doubt that did not otherwise exist.'" *United States v. Blackwell*, 459 F.3d 739, 753 (6th

Cir. 2006) (quoting *Washington v. Schriver*, 255 F.3d 45, 47 (2d Cir. 2001)) (alterations by quoting

court).

     2.    *Analysis*

*a. Exclusion of Evidence of Origin of Semen*

Petitioner first challenges the trial court's exclusion of evidence regarding the origin of

semen found on the victim's underpants. Prior to trial, the court denied petitioner's motion to admit

this evidence, but did permit the parties to enter a stipulation that the victim and her boyfriend had

had sexual intercourse within 24 hours preceding the murder for the purpose of explaining the

possible cause of the victim's vaginal injury. *See* Mot. Tr., dated 9/17/03, at 4-6, Trial Tr., Vol. VII,

at 96. Petitioner contends that, by excluding evidence that the victim's boyfriend was the source of

the semen, he was denied his right to present a defense. The Michigan Court of Appeals rejected

this claim, reasoning:

> It was undisputed that Seabold and her boyfriend, Ronald Campbell, engaged in
> consensual sexual intercourse within twenty-four hours before Seabold's death. The
> parties stipulated as such at trial. Thus, evidence that Campbell was the source of
> semen found in Seabold's underwear would not have been indicative of defendant's
> guilt or innocence. It would not have shed light on any material point. The
> prosecutor did not imply that semen linked to defendant was recovered. Moreover,
> a forensic scientist testified that no seminal fluid or semen linked to defendant was
> recovered from Seabold's undergarments.

*Nye*, 2005 WL 862042, at *5. This determination was reasonable.

30

As noted above, the trial court's evidentiary ruling violated petitioner's right to present a defense only if it "significantly undermine[d] fundamental elements of [his] defense." *Scheffer*, 523 U.S. at 315.  Here, petitioner's defense was not undermined because evidence that Campbell was the source of the semen would not have exculpated petitioner or implicated Campbell any more than the information already available to the jury.  The fact that petitioner was not the source of the semen was already presented to the jury through the testimony of the prosecutor's expert witness, who testified that none of petitioner's semen was recovered from the underwear.  *See* Trial Tr., Vol. VI, at 133, 139-40.  And although the jury was not told that Campbell was in fact the source of the semen, the jury was told that Campbell and the victim had engaged in sexual intercourse within 24 hours preceding the murder.  Because the jury already knew both that (a) Campbell had intercourse with the victim prior the murder and (b) victim was not the source of the semen found on the victim's underwear, the additional information that Campbell was the source of the semen would not have impacted petitioner's defense.  *Cf. Blanton v. Elo*, 186 F.3d 712, 715-16 (6th Cir. 1999) (no denial of right to present defense were excluded evidence was cumulative).  Further, petitioner's defense at trial was not that the murder had been committed by Campbell.  Rather, the evidence of sexual activity was relevant only to support petitioner's claim that the injury to the victim's vagina was not caused by a rape which he perpetrated.  The source of the semen found was not relevant to this issue, and thus was not relevant to petitioner's defense beyond the fact that the semen was not his, which was presented to the jury.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b.  Evidence of Mother's Opinion

Petitioner also contends that he was denied a fair trial by the introduction of evidence that his mother thought he might be guilty.  At trial, petitioner's mother testified that he could not have

committed the murder because he was with her at the time of the murder. *See* Trial Tr., Vol. VII, at 4-12. The prosecutor was permitted to impeach her testimony with a statement she had made to the police after she spoke with petitioner on the phone on the morning after the murder. At that time, she indicated that her son was upset and emotionally, and told the police officer that petitioner's emotional state might be because "I think he may have done it." Trial Tr., Vol. VIII, at 18. The prosecutor did not touch on this statement during closing argument, and the trial court gave a detailed limiting instruction, explaining that the statement could not be used as substantive evidence of guilt but only to assess the credibility of petitioner's mother as a witness. *See* Trial Tr., Vol. XI, at 16-17. The court of appeals rejected petitioner's claim, concluding that the evidence was admissible for impeachment purposes. *See Nye*, 2005 WL 862042, at *5.

Petitioner cannot show that he was denied a fair trial by the introduction of this evidence. Petitioner does not argue that his mother's statement to the police was not proper impeachment evidence; rather, he argues only that the evidence was unduly prejudicial and should have been excluded under Rule 403. However, the trial court gave a proper and detailed limiting instruction explaining that this evidence could only be used to assess the credibility of petitioner's mother as a witness and the prosecution did not argue that the statement made by petitioner's mother was substantive evidence of his guilt. In light of the trial court's proper limiting instruction, petitioner cannot show that the admission of this proper impeachment evidence deprived him of a fair trial. *See Christopherson v. Boone*, 49 Fed. Appx. 257, 261-62 (10th Cir. 2002); *Perez v. Greiner*, No. 01 Civ. 5522, 2002 WL 31132872, at *5 (S.D.N.Y. Sept. 25, 2002); *Brown v. Terhune*, 158 F. Supp. 2d 1050, 1072-73 (N.D. Cal. 2001). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

32

F.      *Sufficiency of the Evidence (Claim IV)*

Finally, petitioner contends that the evidence was insufficient to prove his guilt beyond a reasonable doubt.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970).  Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution.  *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992).  In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).  However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision.  Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Under Michigan law, first degree murder includes "[*m*]*urder* committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, or kidnapping." MICH. COMP. LAWS § 750.316(1)(b) (emphasis added), as well as murder committed with premeditation, MICH. COMP. LAWS § 750.316(1)(a). Under either theory of first degree murder, the prosecution must show that a defendant had the mental state necessary for murder, that is, malice aforethought. *See generally*, *People v. Aaron*, 409 Mich. 672, 713-21, 299 N.W.2d 304, 319-323 (1980); *People v. Turner*, 213 Mich. App. 558, 556, 540 N.W.2d 728, 732-33 (1995) (per curiam). Under Michigan law, malice is established by showing that the defendant possessed one of three mental states: (1) intent to kill; (2) intent to do serious bodily harm; or (3) wanton and willful disregard for the likelihood that the natural tendency of his act is to cause death or great bodily harm. *See Aaron*, 409 Mich. at 733, 299 N.W.2d at 328. Thus, the elements of first degree felony murder are: "(1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result; (3) while committing, attempting to commit,

34

or assisting in the commission of any of the felonies specifically enumerated in M.C.L. §
750.316." *Turner*, 213 Mich. App. at 566, 540 N.W.2d at 732.

      2.    *Analysis*

      Petitioner contends that the evidence is insufficient because there was no physical evidence
linking him to the crime, the absence of physical evidence was inconsistent with the crime scene,
and the jailhouse informants who testified against him were not credible.   The Court should
conclude that the Michigan Court of Appeals's rejection of this claim was reasonable.

      Petitioner gave several statements to inmates in which he admitted killing the victim.
Petitioner argues that this testimony was not credible, but it is the job of the jury, not this Court
sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the
jury resolved those conflicts in favor of the prosecution.   *See Jackson*, 443 U.S. at 326; *United
States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996).   A reviewing court, whether on direct appeal
or habeas review, "do[es] not make credibility determinations in evaluating the sufficiency of the
evidence." *United States v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *Walker v. Russell*, 57 F.2d
472, 475-76 (6th Cir. 1995); *see also*, *United States v. Bailey*, 444 U.S. 394, 414-15 (1980) ("It is
for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated
a cock-and-bull story.").   Further, contrary to petitioner's argument, there was circumstantial
evidence which corroborated the testimony of the jailhouse informants.  For example, a handwriting
expert testified that the written statement petitioner gave to Turner matched petitioner's handwriting.
*See* Trial Tr., Vol. IV, at 256-58.  Turner testified that petitioner mentioned a coat hanger later found
in a photograph of the victim's bedroom but which was not noticed by the police prior to petitioner's
statement to Turner.   *See* Trial Tr., Vol. VII, at 28-29.   This detail itself corroborates Turner's
testimony and belied petitioner's claim that he had not been in the victim's bedroom.  Petitioner also

35

indicated, in his statement to the police, that the victim may have been killed because "she screamed," *id.*, Vol. X, at 181, suggesting that he was there at the time of the murder and thus the killer.  In addition, there was evidence apart from the testimony of the jailhouse informants which corroborated petitioner's guilt.  Petitioner's car was seen driving in the area of the victim's house after the time he claimed he had gone home by two separate witnesses.  *See id.*, Vol. II, at 186-89, 191, 231-33.  Fibers consistent with the carpet found in the victim's bedroom, but nowhere else in the victim's home, were recovered from petitioner, *see id.*, Vol. IV, at 273-77, 283-90, again belying petitioner's claim that he never went into the victim's bedroom.

In short, because credibility determinations are the province of the jury, the testimony of the jailhouse informants alone was sufficient for the jury to determine that petitioner was the perpetrator beyond a reasonable doubt.  This is particularly true here, where the jailhouse informant testimony was corroborated by details of the crime scene, and where petitioner's guilt was corroborated by other circumstantial evidence.  This conclusion is not altered by petitioner's argument that the evidence was insufficient because there was no forensic evidence tying him to the crime.  "Lack of physical evidence does not render the evidence that is presented insufficient."  *United States v. Magallanez*, 408 F.3d 672, 681 (10th Cir.2005); *see also*, *O'Hara v. Brigano*, 499 F. 3d 492, 500 (6th Cir. 2007) (victim's testimony alone sufficient even though not corroborated by other witnesses or physical evidence); *United States v. Bieghler*, 198 Fed. Appx. 566, 568 (8th Cir. 2006) ("'[F]orensic evidence' is not required for conviction.").  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an

unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.      NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991).  *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: June 1, 2009

## CERTIFICATE OF SERVICE

I hereby certify on June 1, 2009 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically.  I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on June 1, 2009: **Jeffrey Nye.**

s/Michael E. Lang
Deputy Clerk